IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| JIMMIE YOUNG | : | No. 15-376-11 |

**MEMORANDUM**

PRATTER, J.                                                                  DECEMBER 9, 2020

Defendant Jimmie Young seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The primary basis for his motion is the COVID-19 pandemic and attendant conditions relating to the pandemic as they may affect Mr. Young. The Government opposes Mr. Young's motion. For the following reasons, the Court denies the motion.

### BACKGROUND

**I. Mr. Young's Criminal Conduct**

Mr. Young assisted in the operation of a large-scale drug trafficking organization that continued for over five years, bringing in large quantities of cocaine and marijuana to the Philadelphia area. (Doc. No. 730 at 1.) In May 2016, Mr. Young was charged in a superseding indictment with one count of conspiracy to distribute five kilograms or more of cocaine and 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) (Count 1), and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 12). (Doc. No. 176.) The mandatory minimum sentence for these crimes was 10 years' imprisonment. (Doc. No. 730 at 3.)

In June 2018, pursuant to a written plea agreement, Mr. Young pled guilty to both counts, and the Government agreed to withdraw a notice it had filed under 21 U.S.C. § 851, based on Mr.

1

Young's prior drug trafficking conviction, which would have doubled the mandatory minimum sentence to 20 years. (Doc. No. 537.) The parties agreed that the appropriate sentence was 150 months. In April 2019, the Court imposed a 150-month sentence. (Doc. No. 648.) Mr. Young is currently serving his sentence at FCI Fort Dix, with an anticipated release date of January 2030, assuming he earns the remaining available good conduct time. (Doc. No. 730 at 4.) In October 2019, he incurred a significant infraction for possessing a hazardous weapon. He was placed in segregation for 60 days and lost 41 days of good conduct time. (Doc. No. 730 at 4.)

## II.    Mr. Young's Request for Compassionate Release

Mr. Young states that he made a request upon his facility's warden for compassionate release but received no response within 30 days. (Doc. No. 721 at 3.) The Government does not take issue with this contention and accepts that Mr. Young has exhausted his request for administrative relief. (Doc. No. 730 at 4.) In June 2020, Mr. Young filed this motion for compassionate release, asserting that, "He is asthmatic. He has a bad heart. He has high blood pressure." (Doc. No. 721 at 3.)

However, Mr. Young's BOP medical records do not support his claim of ill health. Mr. Young is currently 42 years old. (Doc. No. 730.) Upon admission to the BOP, Mr. Young had two initial check-ups in April and May 2019. At that time, he denied having any ailments, including cardiovascular, respiratory, and hypertension. He was not taking any medication. His blood pressure was within the normal range and his body mass index was 31. (Doc. No. 730 at 4-5.) Over the next year, Mr. Young never visited health services and even cancelled a scheduled check-up. In June 2020, Mr. Young presented himself to health services and stated that he had been having chest pains for three to four days. His blood pressure was slightly elevated, but his other vital signs were normal, and his lungs were clear. His Wright peak flow results, which

2

measure expiration, were poor, but these tests rely on a patient's cooperation when exhaling into the device, and the examiner noted "poor effort" by Mr. Young. (Doc. No. 730 at 5.) Several other diagnostic tests revealed no significant issues. As of the Government's response, Mr. Young had not presented any further concerns to health services related to his June 2020 visit. While he did visit health services in August, this was for an unrelated skin condition. (Doc. No. 730 at 5.)

### III. BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[1] and it has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.[2] The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions nine months ago, in March of this year.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover,

---

[1] BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Dec. 4, 2020).

[2] BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Dec. 4, 2020).

official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to

---

[3] This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

BOP's aggressive efforts at combating the effects of the pandemic have extended to FCI Fort Dix, the largest federal prison in the United States in terms of capacity. *See Wragg v. Ortiz*, 462 F. Supp. 3d 476, 484 (D.N.J. 2020). Fort Dix currently houses 2,739 inmates. As explained further below, while Fort Dix had a significant stretch of time with hardly any COVID-19 cases, as of December 7, 2020,[4] there are currently 103 COVID-positive inmates and 36 COVID-positive staff members; so far this year, 266 inmates and 6 staff members have recovered from COVID-19.

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[5] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement,[6] a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons

---

[4] The data is current as of December 8, 2020, according to the BOP website, available at https://www.bop.gov/coronavirus.

[5] "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

[6] The Government does not contest that Mr. Young has met the exhaustion requirement. (Doc. No. 730 at 4.)

5

warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[7] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant

---

[7] Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. Apr. 1, 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

6

bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

### DISCUSSION

The Court certainly does not minimize the critical health risk posed by COVID-19. But as concerning as the current pandemic is, resolving Mr. Young's motion still calls upon the Court to take into serious consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Young argues that he should be released given his recent complaint of chest pain in June 2020 and other medical issues. Although COVID-19 is a dangerous, and sometimes lethal, virus for all individuals, the Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness or death.[8] "While this court is not bound by the CDC's guidelines, it follows suit with many other district courts who have turned to the guidance as reliably informative." *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (listing cases).

But for COVID-19, Mr. Young would likely present no basis at all for compassionate release. However, given the COVID-19 pandemic, Mr. Young contends that his asthma, "bad heart," and high blood pressure present serious at-risk conditions. (Doc. No. 721 at 3.) He further contends that his overall health situation and ability to care for himself have declined since he entered BOP custody, and due to his medical conditions, Mr. Young asserts that he is more

---

[8] *See People at Increased Risk*, Centers for Disease Control and Prevention (Nov. 30, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Dec. 4, 2020).

susceptible to severe illness and death from COVID-19. However, these purported medical issues do not necessarily, actually or theoretically, warrant the emergency relief Mr. Young requests.

Mr. Young asserts that he suffers from a condition that is a CDC risk factor in relation to COVID-19. The Government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." *See* U.S.S.G. § 1B1.13 n.1. The CDC has recently revised its list of people with certain medical conditions who "are at increased risk of severe illness" from COVID-19.[9] The CDC also lists several conditions where there "might be an increased risk for severe illness," but insufficient data exists to say more. Mr. Young points to no condition that he currently has that is considered high-risk by the CDC.

Although he does not reference it in his motion, in May 2019 Mr. Young's body mass index, based on his height and weight, was 31. The CDC identifies obesity, or those with a BMI of 30 or greater, as presenting an increased risk.[10] However, Mr. Young is just barely above that threshold. And as detailed in the above guidelines policy statement, a qualifying medical condition is only one in which the inmate is "not expected to recover." Here, Mr. Young can move out of this risk category. Accordingly, in general, courts have been reluctant to grant compassionate release based solely on obesity. *See United States v. Williams*, No. 15-cr-471-3, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17, 2020) ("[O]besity during the age of the COVID-19 pandemic does not necessarily mean, on its own, that extraordinary and compelling reasons justify the reduction of his sentence."); *United States v. Grasha*, No. 18-cr-325, 2020 WL 5747829, at *5

---

[9] *People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 1, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Dec. 4, 2020).
[10] *Id.*

8

(W.D. Pa. Sept. 24, 2020) (finding defendant's obesity and BMI of 48, while presenting a serious risk, did "not arise to an extraordinary and compelling reason for release").

Mr. Young also claims that he presents a "bad heart," but there is no evidence of that in the record. Mr. Young also points to asthma and high blood pressure. However, both of these conditions are only identified by the CDC as those which *might* cause an increased risk for severe illness due to COVID-19, with the former only including moderate to severe asthma, which Mr. Young has not shown. He has also never described any regular symptoms or the effect on daily life that characterizes moderate to severe asthma. *See United States v. Towel*, No. 17-cr-519-6, 2020 WL 2992528, at *4 (E.D. Pa. June 4, 2020) (finding that mild asthma does not rise to level of "extraordinary and compelling" where defendant "does not require daily asthma medication, his symptoms do not interfere with daily activities, and his lung function tests appear normal"). As to high blood pressure, Mr. Young points to no diagnosis or treatment for hypertension. His June 2020 visit to health services for alleged chest pains did not establish that he had either of these conditions or a "bad heart."[11]

Mr. Young's stated medical conditions do not present an extraordinary and compelling reason for his compassionate release. Mr. Young's health concerns appear to have first surfaced in June of this year. After receiving a thorough evaluation and being prescribed medication, he did not present again at health services for those same symptoms. Thus, it appears that any conditions Mr. Young currently has are being well-controlled with medication and he does not have any impediment to his ability to provide self-care in the institution.

---

[11]  Mr. Young's BOP medical records show that during his June 2020 visit he had slightly elevated blood pressure. Notes from his evaluation stated that there was no documentation as to a history of asthma, but Mr. Young was given an albuterol inhaler and aspirin; a chest x-ray revealed no disease. An EKG was also performed, returning a "borderline" result, which demonstrates no clear evidence of abnormality. (Doc. No. 730 at 5.)

9

As to the current situation at FCI Fort Dix, the Court in no way minimizes the threat that COVID-19 poses. In early October, there were zero reported cases of COVID-19 at Fort Dix, but as of November 23, 2020, 246 inmates and 18 staff members tested positive for the virus. *United States v. Staats*, No. 17-cr-461-1, 2020 WL 6888224, at *2 (E.D. Pa. Nov. 24, 2020). Currently, as of December 7, 2020, Fort Dix reports 103 inmates and 36 staff members are COVID-positive, while 266 inmates and 6 staff members have recovered.[12] While this is a fluid and serious situation, in light of the documented decreasing total number of COVID-19 infections, the Court sees that Fort Dix is engaged in strenuous efforts to protect its inmates and staff members against further spread of COVID-19. Thus far, the facility has treated any inmate or staff member who contracted COVID-19, and the BOP website continues to provide transparent information with the community about positive cases and recoveries.

Even if Mr. Young had presented an extraordinary and compelling reason that warranted his compassionate release, the Court's consideration of the § 3553(a) factors necessitate a denial of Mr. Young's motion. Mr. Young has failed to show how releasing him before he serves the full term of his sentence would align with the statutory sentencing factors, notably the seriousness of his offense, the need to promote respect for the law, the need to provide just punishment for the offense, and the need to deter others from similar criminality. *See* 18 U.S.C. § 3553(a). Mr. Young was a leader in a significant drug trafficking organization, and in addition had a lengthy criminal history prior to that. Mr. Young argues that his "new medical conditions foreclose[] any probability of dangerous recidivism." (Doc. No. 721 at 8.) The Court disagrees. Mr. Young continues to present a danger to the community. His criminal conduct involved a conspiracy to distribute cocaine and marijuana as well as money laundering. Even if Mr. Young did have

---

[12] The data is current as of December 8, 2020, according to the BOP website, available at https://www.bop.gov/coronavirus.

underlying high-risk medical conditions, his crimes were serious, and an early release would not provide just punishment or serve as a deterrent to others. *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (noting district court reasonably concluded early release not warranted where defendant's "crimes were extraordinarily serious" and required "a significant period of incarceration").

Mr. Young has not yet served the bulk of his sentence. He argues that the amount of time he has served "adequately reflects the seriousness" of his offenses and has provided just punishment. (Doc. No. 721 at 8.) The Court disagrees. Mr. Young has only served approximately 19 months, or not quite 13%, of his 150-month sentence. An early release would be contrary to the § 3553(a) factors. *See United States v. Torres*, No. 18-cr-414, 2020 WL 3498156, at *10 (E.D. Pa. June 29, 2020) (denying compassionate release for 36 year-old inmate with mild asthma due to seriousness of his crime and having only served 15% of 63-month sentence); *United States v. Shulick*, No. 16-cr-428, 2020 WL 3250584, at *5 (E.D. Pa. June 16, 2020) (denying compassionate release where defendant had only served 19 months of a 60-month sentence for embezzlement, fraud, and filing false tax returns).

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Young's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE